## Board of Public Education v. Watson, Appellant.

Argued January 8, 1960.  Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Philip Dorfman,* with him *Dorfman, Pechner, Sacks & Dorfman,* for appellant.

*C. Brewster Rhoads,* with him *Edward B. Soken, Sidney L. Wickenhaver,* and *Montgomery, McCracken, Walker & Rhoads,* for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, June 30, 1960:

The only difference between this case and *Board of Public Education v. Intille, Deacon* and *Atkinson,* p. 1, ante, is that, here, the appellant, Goldie Watson, a Philadelphia public school teacher, relied upon the constitutional guarantees of the First Amendment, instead of the Fifth, in justification of her refusal to answer certain questions propounded by a Sub-committee (known as the Velde Committee) of the Un-American Activities Committee of the House of Representatives,[1] concerning membership in and association with the Communist Party. Except for the indicated difference in plea in refusing to answer the Committee's inquiries, the material facts of this case are substantially the same as those in the cases of *Intille, Deacon* and *Atkinson,* cit., supra.

Mrs. Watson became a regular teacher in the Philadelphia public schools in 1931 with tenure, after 1937, under the Public School Code. On February 17, 1954, pursuant to a subpoena, she appeared before the Congressional Committee. She gave the Committee her name, address and a resume of her educational background and employment record as a teacher. When

---

[1] As in the case of *Board of Public Education v. Intille, Deacon* and *Atkinson,* p. 1, ante, the term Committee, wherever it appears in this opinion, shall be taken to mean the above identified Sub-committee of the Un-American Activities Committee of the House of Representatives of the United States.

asked whether she had ever been a member of the Communist Party and similar questions relating to past Communist affiliations on her part, she declined to answer and explained that such questions in her view were "in violation of her constitutional rights and that she particularly relied on the First Amendment." Within *one* day (viz., on February 18, 1954) Dr. Louis P. Hoyer, Superintendent of the Philadelphia Public Schools, re-rated Mrs. Watson "unsatisfactory" as a professional employee of the School District and suspended her from her position as a teacher in an elementary school. Dr. Hoyer sent her a letter informing her that she had been rated "unsatisfactory" as a result of her refusal to answer questions propounded by the Committee. On March 9, 1954, the Board preferred charges of incompetency against Mrs. Watson as a ground for her dismissal on Dr. Hoyer's recommendation.

A hearing before the Board of Education on the charges was held on June 4, 1954, at which time a transcript of Mrs. Watson's testimony before the Committee, including the unanswered interrogations made of her, was introduced in evidence. Dr. Hoyer stated at the hearing that he had rated Mrs. Watson "unsatisfactory" on the basis of an official rating card prepared and distributed by the Department of Public Instruction of the Commonwealth and that, as the basis of his re-rating, he had checked three items listed on the card in respect of which he had found her deficient, namely, (1) civic responsibility, (2) judgment, and (3) appreciation and ideals. He testified that in his opinion Mrs. Watson, by refusing to answer questions of the Committee concerning her subscription to subversive doctrines, had exhibited improper civic responsibility, poor judgment and a lack of appreciation and ideals. He also testified, however, that school records

showed that Mrs. Watson had been a competent teacher during all of the twenty-three years she had continuously taught in the Philadelphia public schools.

No other evidence to support the charge of incompetency against Mrs. Watson was offered at the hearing. Nor was she asked any questions by the Board or the Superintendent at the hearing until she offered to and did testify. She explained that she had refused to answer questions at the Committee hearing because she felt that the Committee was conducting an inquisition with no legitimate legislative purpose, that the members of the Committee were using the hearings for purposes of personal political aggrandizement, that the Committee had no right to inquire into her associations and beliefs, and that her freedoms of speech and association guaranteed by the First Amendment would be violated if she were compelled to answer the Committee's questions. Both Mrs. Watson and Dr. Hoyer testified that she had spoken frankly to him in his office in October of 1952 concerning her loyalty and her membership in a number of organizations and that, at the conclusion of the interview, Dr. Hoyer had told her that he was satisfied that she had answered all of his questions satisfactorily.

On June 29, 1954, the Board dismissed Mrs. Watson from her position as a teacher on the charge of incompetency for her failure to answer questions of the Committee. She appealed from the action of the Board to the Superintendent of Public Instruction of the Commonwealth who, on January 17, 1955, dismissed her appeal and affirmed the action of the Board.

Mrs. Watson then appealed to the Court of Common Pleas of Philadelphia County from the Superintendent's order affirming her dismissal. The court dismissed her appeal and affirmed the order of the Superintendent of Public Instruction citing as the basis for

its action the reasons set forth in its opinion in *Board of Public Education School District of Philadelphia v. Atkinson,* Phila. C. P. No. 3, December Term 1954, No. 8315. The reasons so assigned in the *Atkinson* case were (1) that a refusal to answer questions propounded by the Congressional Committee relating to alleged Communist affiliations of the witness renders a teacher "incompetent" within the intent of the Public School Code, and (2) that a discharge on the ground of incompetency for refusal to answer the Committee's questions does not violate a teacher's rights under the Federal Constitution.

So far as the ground assigned for Mrs. Watson's dismissal as a public school teacher and the procedure by which it was effected are concerned, this case is not one bit different from the *Intille, Deacon* and *Atkinson* cases, cit. supra, in which we have this day handed down an opinion sustaining the appellant teachers' contentions and ordering their reinstatement to the positions from which they were suspended and later dismissed.

Even if Mrs. Watson's plea of the First Amendment was not well placed (cf. *Barenblatt v. United States,* 360 U. S. 109), her refusal to answer the Committee's questions did not render her incompetent as a public school teacher. Just as in the *Intille, Deacon* and *Atkinson* cases, here, also, the appellant did not refuse to answer *any* question of her *administrative superior* (Dr. Hoyer) and her employer Board did not ask her any. All that was produced at the hearing before the Board to support the charge of incompetency against the appellant was a transcript of the record of her appearance before the Committee when she refused to answer certain questions on a plea of constitutional right under the First Amendment so to do. If the privilege claimed was not legally available to the wit-

ness in the circumstances, that fact would not serve to prove her guilty of the charge of incompetency in her position as a Pennsylvania school teacher with tenure.

If a witness persists in refusing to answer questions of a Congressional Committee on asserted constitutional grounds, which the Committee does not acknowledge as a legal basis for the refusal to answer, a citation for contempt is in order and the witness can be indicted and found guilty of contempt of Congress. But, even that eventuality would not render the witness liable to a State penalty for having refused to answer the Committee's questions on a plea of a constitutional privilege. As matters transpired in Mrs. Watson's case, her plea of the First Amendment would appear to have been properly interposed.[2] But, even if the plea was not validly lodged, the most that could be said of the witness's refusal to answer the Committee's questions was that she acted on a mistaken belief as to what her constitutional rights were under the First Amendment. The record in this case does not furnish the slightest inference, nor does anyone venture to suggest, that Mrs. Watson's plea of the First Amendment was made either in bad faith or frivolously. Such being the unquestioned situation, "Obviously the State could not draw unfavorable inferences as to [her] truthfulness, candor or [her] moral character in general if [her] refusal to answer was based on a belief that the United States Constitution prohibited the type of in-

---

[2] For her refusal to answer the Congressional Committee's questions imputing past Communist affiliations, Mrs. Watson was indicted for contempt of Congress on five counts, (a separate count for each of five unanswered questions relating to Communism). At a trial before a judge without a jury, she was found guilty of the contempt charged and sentenced. On appeal to the United States Court of Appeals for the District of Columbia Circuit, the conviction was reversed on June 18, 1960, and the case remanded *with instructions to dismiss the indictment.*

quiries which the Committee was making": *Konigsberg v. State Bar of California,* 353 U. S. 252, 270 (1957).

Nor can the witness be faulted for a mistaken belief (if such it was) as to what her constitutional rights were under the First Amendment. Her appearance before the Committee antedated by more than five years the decision of the Supreme Court in *Barenblatt* where it was held (five to four), in circumstances quite similar to the present case, that the First Amendment did not justify Barenblatt's refusal to answer questions of the same Congressional Committee concerning Communism. We have referred to the division in the Court in *Barenblatt* only to stress the fact that, where four of the nine well trained legal minds of the Supreme Court hold to the opinion that the First Amendment justified Barenblatt in his refusal to answer the Committee's questions, surely a person untrained in the law cannot justly be thought to be incompetent for entertaining a like opinion and acting upon it.

This case presents, then, the dismissal of the appellant, a teacher with tenure, by the Board of Education solely because she refused to answer certain questions of the Congressional Committee in reliance on asserted constitutional rights. This did not constitute lawful ground for the Board's abrogation of the appellant's contract as a professional employee of the Public School District on a charge of incompetency. As recognized in *Slochower v. Board of Higher Education of New York,* 350 U. S. 551, 558, "It [was] one thing for the city authorities themselves to inquire into Slochower's fitness, but quite another for his discharge to be based entirely on events occurring before a federal committee whose inquiry was announced as not directed at 'the property, affairs, or government of the city, or . . . official conduct of city employees.' " Here, likewise, the Congressional Committee was not charged with the duty

of ascertaining which, if any, of Philadelphia's school teachers, was incompetent within the meaning of the Pennsylvania Public School Code.

In *Board of Public Education v. Beilan,* 386 Pa. 82, 94, 125 A. 2d 327, which the appellee presently cites, this court squarely based Beilan's dismissal on the ground that he had refused to answer questions of his Superintendent in matters touching his capacity as a teacher. Speaking for the court, Mr. Justice CHIDSEY said, "We are satisfied that his refusal to answer the inquiry of his *administrative superior* constituted incompetency within our definition of that term." (Emphasis supplied.) And, on *certiorari,* the Supreme Court of the United States recognized, in affirming, 357 U. S. 399, 409 (1958), that "The Pennsylvania Supreme Court merely equated refusal to answer *the employing Board's* relevant questions with statutory 'incompetency'." (Emphasis supplied.)

We also hold, in keeping with our decision in *Board of Public Education v. Intille, Deacon and Atkinson,* p. 1, ante, that a teacher's refusal to answer questions touching her loyalty does not constitute "incompetency" within the meaning of that term as used in the Public School Code of 1949 and that any proceeding looking to the dismissal of a teacher with tenure for alleged disloyalty must be brought and proceeded with under the provisions of the Pennsylvania Loyalty Act of December 22, 1951, P. L. 1726 (65 PS §211 et seq.).

It follows, therefore, that the Board's dismissal of the appellant on the ground of alleged incompetency, which was based alone on her refusal to answer questions of the Committee on a plea of privilege under the First Amendment, deprived her without lawful cause of her right to follow her profession, as a teacher with tenure, in violation of the due process requirement of the Fourteenth Amendment.

While it is unnecessary for us to pass upon the appellant's additional contention that the hearing given her by the Board did not comply with the requirements of procedural due process, reference to the hearing, and the curtailed manner in which it was conducted, will serve to pinpoint further the important fact, which stands out glaringly in the record, that the appellant was dismissed solely because of her refusal to answer certain questions of the Committee in reliance on a constitutional privilege. The Board's charge against the appellant being incompetency in her capacity as a teacher, she called twelve well qualified witnesses, according to counsel's offers of proof, to testify to her competency as a teacher and to her keen sense of civic responsibility, sound judgment, and appreciation and ideals of citizenship. An objection by counsel for the Board to each of the proffered witnesses was sustained by the Board on the ground that their testimony would be irrelevant and immaterial to the charge which was based exclusively on her refusal to answer the Congressional Committee's questions. Whether the excluded testimony of the witnesses offered by the appellant would have been credible or not, it would seem to have been both relevant and material to her refutation of any appropriate charge of incompetency.

The order of the court below is reversed and the record remanded for further proceedings not inconsistent with this opinion.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

My distinguished colleague Justice EAGEN begins his admirable and formidable dissent with the phrase: "I emphatically dissent!" If there were a way to emphasize "emphatically", I would do so, for I regard the decision of the Court in this case as a most unfortunate

one. It is one to baffle the intellect, confound the law, and set at hazard the scales in which are weighed the civic responsibilities and moral values expected of and required in a school teacher.

If Mrs. Goldie Watson, the teacher involved in this case, had publicly declared that she would not respect the courts of Pennsylvania and the United States, there can be no doubt that this Court would have affirmed any decision of the Philadelphia school authorities which dismissed her as lacking the competence needed to teach children. Equally, if she had declared that she had no respect for the office of the President of the United States, this Court would undoubtedly have agreed that she had proved herself disqualified and incompetent to teach the future citizens of this country. But because Mrs. Watson treated with scorn and contumely the legislative branch of our government, this Court sees no fault in Mrs. Watson which would justify her dismissal. If there is logic in this kind of a distinction, it escapes me.

The Majority says that the only difference between this case and the *Deacon-Intille-Atkinson* case (decision handed down the same day), is that the teachers Deacon, Intille and Atkinson pleaded the Fifth Amendment and Mrs. Watkins pleaded the First Amendment. This is like saying that the only difference between the defenses offered by two men individually charged for murder is that one pleaded he had fired in self-defense and the other said that he killed because he hated his victim.

The difference between the Fifth and the First Amendment is the difference between A and Z. The Fifth Amendment was designed to save one from giving evidence against himself in a criminal prosecution. The First Amendment is a prohibition on Congress against the passage of certain types of legislation. The

only thing they have in common is that they are both Amendments. In addition, and contrary to what the Majority says, the facts in this case are different from the facts in the *Deacon-Intille-Atkinson* case. In that case the three teachers were asked by the House Un-American Activities Committee with regard to their alleged past subversive activities and they refused to answer on the ground that their answers might incriminate them. This Court held they could not be dismissed from their school positions for having invoked a Federal right. But in the present case the teacher Mrs. Watson did not invoke the Fifth Amendment. She pleaded the First Amendment; and the School Board properly dismissed her. And this Court, in as attenuated a reasoning process as I have seen in judicial opinions, holds that Mrs. Watson could not be dismissed anyway. Why?

The House Un-American Activities Committee was conducting an investigation into alleged Communist infiltration in the Philadelphia schools. In the process of this investigation, it put a perfectly reasonable question to Mrs. Watson, namely: "Did you ever attend a Communist school or a school for instruction of Communist teachers in New York state?"*

Could anything be more relevant? Could anything be more conducive toward obtaining specific information with regard to the alleged Communist infiltration in the schools of Philadelphia than ascertaining whether school teachers were being instructed on how to teach Communist ideology? Now, if the answer to that question would have subjected Mrs. Watson to possible criminal prosecution, she would have had the right under the Fifth Amendment to refuse to answer. Speaking as a member of this Court I do not believe that such an answer would entitle her to hold her job, but the

---

* Italics throughout, mine.

Majority held to the contrary in the *Deacon-Atkinson-Intille* cases. However, I repeat and emphasize, Mrs. Watson in this case did not invoke the Fifth Amendment.

The chairman of the sub-committee conducting the hearing even suggested that she could plead the Fifth Amendment, but she declined to accept its protection. She wanted her defiance of the Committee to be complete. She said that the committee had no right whatsoever to ask her questions about her "associations, memberships, conferences, or speeches." It will be noted that here, Mrs. Watson, making use of the well-known trick in debate to ascribe to one's opponent what he has not said and then reply devastatingly to that unspoken accusation, included among the things that the committee could not ask her about, her "conferences or speeches." No one had asked her about her conferences or speeches, nor was there any evident intent that the committee would question her about her conferences and speeches. She was asked about her participation, if any, in a movement committed to destroying the American school system, but Mrs. Watson declined to answer. According to Mrs. Watson's reasoning, she could attend a school of instruction on how to make plans for the assassination of the President of the United States, and she still would be free from inquiry as to whether, as a school teacher, she attended such a school. Counsel for the committee, Mr. Kunzig, asked her a second time: "Have you ever attended any Communist instruction school at any place?" And her answer was: "Mr. Kunzig, I refuse to answer, specifically on the basis of my rights as guaranteed by the First Amendment to the Constitution."

What were her rights under the First Amendment? The Majority avoids the subject entirely. Let us see what the First Amendment says. Here is its precise

wording: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Now, what possible connection can this Amendment have with Mrs. Watson's refusal to reply to a question about attending a Communist school? Absolutely nothing. So far as relevancy is concerned, Mrs. Watson might just as well have cited the Marquis of Queensberry rules.

The Majority makes no attempt to rationalize the propriety of Mrs. Watson's invocation of the First Amendment. It says in effect that it does not matter. It says in effect that Mrs. Watson could do what she pleased. She could reply or not reply as she wished. In other words, the committee had no right to question her at all. Is this law? And does this kind of a ruling breed respect for authority?

The Supreme Court of the United States said in the case of *Barenblatt v. United States,* 360 U. S. 109, 112: "An educational institution is not a constitutional sanctuary from inquiry into matters that may otherwise be within the constitutional legislative domain merely for the reason that inquiry is made of someone within its walls."

In that case the Supreme Court pointed out that the right of the House Un-American Activities Committee to conduct an inquiry into the subversive antecedents of the teacher Barneblatt was "unassailable." In that case Barneblatt had been asked if he was currently a member of the Communist Party and if he had ever been a member of that organization. He refused to answer and did not plead the Fifth Amendment. He was indicted for contempt of Congress and was convicted. The Supreme Court affirmed the conviction.

Despite this precedent, which is as clear as the sun striking the Capitol dome at high noon, the Majority sees nothing wrong about Mrs. Watson's defying a Congressional committee questioning her on a matter within the indisputable purview of its investigatory powers. The Majority justifies Mrs. Watson's conduct by relating what she said before the school board. The Majority relates: "She explained that she had refused to answer questions at the Committee hearing because she felt that the Committee was conducting an inquisition with no legitimate legislative purpose, that the members of the Committee were using the hearings for purposes of personal political aggrandizement, that the Committee had no right to inquire into her associations and beliefs, and that her freedoms of speech and association guaranteed by the First Amendment would be violated if she were compelled to answer the Committee's questions."

Whereas the Majority see justification in this narrated conduct, I see impertinence, effrontery, and insolence. Mrs. Watson's statement was not an explanation of conduct, it was an *attack* on constituted authority. The Supreme Court said, in appraising a similar situation in the *Barenblatt* case: "It goes without saying that the scope of the Committee's authority was for the House, not a witness to determine, subject to the ultimate reviewing responsibility of this Court."

And then the Majority absolutely ignores the strong language of the Supreme Court in that same *Barenblatt* case where it said: "That Congress has wide power to legislate in the field of Communist activity in this Country and *to conduct appropriate investigations* in aid thereof, is hardly debatable . . . In the last analysis *this power rests on the right of self-preservation*, 'the ultimate value of any society.' "

The decision of this Court, if carried to its logical conclusion, would deny the School District of Philadel-

phia the right of self-preservation, for how can any school system survive if it is required to hire and retain school teachers who are disrespectful of the government in word and deed?

Now, Mrs. Watson was a Communist or she was not a Communist. No one can honestly deny the fairness and accuracy of that statement. Yet, although there was definitely before the Congressional Committee sworn testimony by a Mrs. Dorothy Funn that she had known Mrs. Watson as a member of the Communist Party, Mrs. Watson refused to deny this accusation. In other words, in the face of a direct charge that she belonged to an organization committed to the destruction of our government by force and violence, an organization committed to destruction of the Philadelphia schools, an organization committed to a destruction of faith in a Supreme Being, she refused to deny the accusation.

And her refusal to answer was not based on any theory that she feared criminal prosecution. Her refusal to answer was based on the gargantuan presumption that she was greater than the Congressional Committee and that they did not dare question her about her associations and memberships. Although our government is based upon the proposition that everybody is amenable to the processes of law, Mrs. Watson insisted that Congress itself, representing the law, had no right to question her. And this Court supports her in this unmitigated demonstration of conceit and self-assumed superiority.

Professor Wigmore, in his monumental work on Evidence, has said: "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence . . . This contribution is not to be regarded as a gratuity, or a courtesy, or an ill-requited favor. It is a duty, not to

be grudged or evaded. *Whoever is impelled to evade or to resent it should retire from the society of organized and civilized communities, and become a hermit.* He who will live by society must let society live by him, when it requires to.

. . .

"From the point of view of society's right to our testimony, it is to be remembered that the demand comes, not from any one person or set of persons, but from the community as a whole,—from justice as an institution, and from law and order as indispensable elements of civilized life . . ." Wigmore on Evidence, Vol. VIII, Sec. 2192.

A person who witnesses, even involuntarily, the happening of an accident or the commission of a crime and is subpoenaed as a witness to testify as to what he knows of the accident or crime, may not excuse himself from testifying by questioning the motives of the court. He may not be excused from testifying for any reason, except that of possible self-incrimination for crime, which Mrs. Watson excluded from her reasons for not testifying.

As a member of society, a witness has the obligation to tell what he knows for the protection and preservation of that society, and for upholding the concept of justice. He has that duty as much as a passenger aboard a stricken ship is required to aid in seeking to keep her afloat, so as to save the ship and all the passengers, including himself, from sinking.

Mrs. Watson had no more right to refuse to answer the questions put to her by the Congressional Committee than she would have had the right to refuse to testify to an accident she had witnessed. I must repeat that since she did not invoke the Fifth Amendment, her refusal to answer was a demonstration of disobedience to constituted authority, which disobedience, in itself, proved her utterly unworthy and incom-

petent to be a teacher of the children of Philadelphia, who want instruction on good citizenship, by way of example, from their teachers.

Mrs. Watson's complete destitution of sincerity and utter lack of moral civic responsibility is irrefutably established in the following. She was asked by the chairman of the committee: "Did you take the loyalty oath?"

Defiantly she replied: "I will not answer that question." Now, why wouldn't she answer that question? She either took the loyalty oath or she did not. Her refusal to answer was sheer insolence, nothing else, and, in a court of law, would have subjected her to charges of contempt instanter.

Later on, she conferred with her counsel and then said: "It is a matter of public record that I took the loyalty oath."

And here comes the crucial feature of her insincerity, purposeful irresponsibility, and demonstrated lack of competence to be a school teacher or to hold any office requiring candor, consideration and reliability. The chairman asked her: "Now, at the time you took the loyalty oath were you a member of the Communist Party?" Mrs. Watson replied: "I refuse to answer the question on the basis of the First Amendment."

Now, if Mrs. Watson was a member of the Communist Party when she took the loyalty oath, she committed outright perjury. If she was not a member of the Communist Party when she took the oath, her refusal to answer so simple and so vital a question revealed her as being contemptuous to the ultimate degree. Why shouldn't she answer the question if she was not a member of the Communist Party when she took the Loyalty oath? The Majority Opinion doesn't even mention this conclusive demonstration of Mrs. Watson's brazenry, insolence, and reckless disregard of the most elementary rule of good citizenship. A per-

formance of this kind on the part of a college student could subject him to expulsion. Why, in a school teacher, should it be an invitation to repeat this scandalous demeanor in the presence of young children?

The chairman of the Congressional Committee, evidently amazed at Mrs. Watson's haughty attitude and wishing to make sure that she understood the question, directed her for the second time to answer; and Mrs. Watson, apparently fully resolved to show her defiance to the last breath, again refused to answer.

Could the School Board, learning of this shocking event, give Mrs. Watson a rating of "satisfactory" as a school teacher? Did Mrs. Watson not, by that act of boundless arrogance and conceit, establish herself completely lacking in a sense of civic moral responsibility, so indispensable in the equipment of a teacher?

Did all this not demonstrate her to be incompetent? The rating of competency is not limited to technical qualifications. Character, moral stamina, wholesome ideals are as much a part of a teacher's equipment as knowledge of the curriculum. This was made clear in our decision in the case of *Horosko v. Mt. Pleasant Township School District,* 335 Pa. 369. I treated the matter of school teacher competency at length in my Dissenting Opinion in the *Deacon-Intille-Atkinson* case, and, by reference, I incorporate that treatment in this present Dissenting Opinion.

Mrs. Watson's behavior was the worst possible example to school children on how to behave. What school children need more than anything else is a demonstration of respect for the law and courtesy toward one's elders and those in responsible authority. They certainly did not get it from Mrs. Watson. What Judge ALESSANDRONI so ably said in another case could well apply to Mrs. Watson, namely: "Whether plaintiff is a subversive or not, such wretched conduct before a committee of the highest legislative branch of our Re-

public, can only foster in the impressionable children under her tutelage, a settled contempt and arrogance for our country and its lawmakers." (*Intille v. Hoyer*, 88 Pa. D. & C. 512, 514-515)

I think it is important to keep in mind, as counsel for the School Board correctly said in his able brief: "The Supreme Court of the United States has not held that refusal to answer questions of a Congressional Committee can never be made the basis for dismissal from state employment."

I think no one would seriously dispute that there are many people who are well educated and technically trained, but who are so lacking in moral sense and so self-centered and overbearing in their conduct that they cannot possibly be assigned to any position where they must deal with other people on the basis of understanding sympathy. There is no position in civilization where the virtues of mutual respect, civic obedience, good judgment, tranquil demeanor and sympathetic understanding are so necessary as in a school teacher's position. How do we determine whether a person possesses the moral qualifications and sensitive intellectual equipment to make him a good teacher? Obviously this determination can only result from observing that person in his relaionship with other people. The school authorities of Philadelphia found, from Mrs. Watson's performance before a Committee of the United States Congress and her attitude before the School Board, that she lacked an appreciation of civic responsibility, good judgment and an awareness of the ideals of this country. I have studied the record and conclude that the Philadelphia School Board did not abuse its discretion in dismissing Mrs. Watson as being incompetent to teach in the Philadelphia schools.

The Majority does not even discuss the question of abuse of discretion. As a matter of fact, and I say this

with respect, it is difficult to ascertain from the Majority Opinion just why the Majority concludes that Mrs. Watson has proved herself a good teacher when the School Board, which is charged with the responsibility for that determination, has found exactly to the contrary.

The Majority overlooks that the School Board informed Mrs. Watson in the notice of suspension that: "The reason for your suspension is that you have shown a lack of fitness to be a teacher in that you have displayed *conduct* unbecoming your professional status as a teacher."

Her conduct was not only unbecoming her professional status as a teacher, but in many ways it was indicative of a sympathy with the methods used by Communists in the dissemination of their subversive propaganda. When she appeared before the School Board, she said that investigators of the House Un-American Activities Committee had called on her and she related some of her conversations with them. In that narrative she said: "I told them that I have had a rule for twenty-two and a half years, that when a pupil walks to my desk he says I; that nothing would make me cooperate with the Committee."

Whether Mrs. Watson ever attended a Communist school for teachers I have no way of knowing, but she certainly conducted herself in the manner one could associate with a person who had attended such a school. Here she is revealed, by her own words, that even in the presence of her own pupils she wanted to stand as one who would not cooperate with a Congressional committee. Was this not a statement which showed that she wished her pupils to think disrespectfully of Congress and its Committees? Should further evidence be required of Mrs. Watson's utter unfitness as a school teacher?

Why did she refuse to testify before a Congressional Committee? Listen to her explanation: "And it would have been the lowest type of moral courage and morals for me to have permitted myself to become a stool-pigeon and an informer because I had been informed on."

*What* had she been "informed on"? The evidence in the record is that a Mrs. Dorothy Funn had informed on her as being a member of the Communist Party. The investigators of the Committee told Mrs. Watson that there were three persons who were ready to testify that they had known Mrs. Watson as a Communist. Were these statements verifiable or not? Mrs. Watson did not deny she had been a member of the Communist Party. She was indignant because she had been *"informed on"*, and for that reason she said she would not permit herself to become a "stool pigeon." Is this the language of a respectful and respected school teacher? Moreover, being a "stool pigeon" imports an intimate personal knowledge of a criminal enterprise.

In Mrs. Watson's concept of government, testifying before a Congressional Committee makes one a "stool pigeon." No one was asking her to tell lies before the Committee. Thus, if she told the truth, according to her own statement, this would make her a stool pigeon. Did she mean by this statement that she would thus be informing on fellow-Communists?

Mrs. Watson's language of defiance was even stronger than thus far quoted. She said: "When I walked into that room I knew that no power, no power on God's earth could make me become a part of something that I thought was wrong, . . ."

She thought it was so wrong to testify before a Congressional committee that "no power on God's earth" could compel her to do it. And yet, every day hundreds of excellent citizens appear before House and

Senate committees to testify on facts, plans, statistics, observations—all to help Congress in formulating legislation for the welfare of the country. Our Government simply could not operate without the information which Congressional committees obtain from witnesses: experts, technical consultants, educators, and so on.

But Mrs. Watson regarded testifying before a committee, required by an Act of Congress to obtain information peculiarly within her knowledge and the obtaining of which would help preserve American freedoms, as something disgraceful. In speaking of her unbridled defiance of the Committee she exclaimed: "Democracy is running down the drain."!!!

And this is the kind of person that this Court practically bestows an accolade upon by officially approving her arrogant and disrespectful behavior before a Congressional Committee and her superiors, the School Board of Philadelphia.

I am firmly convinced that a reflective reading of the record in this case will prove conclusively that Mrs. Watson lacks the stability of character, the respect of authority, the clearness of judgment, and the attachment to ideals of American citizenship, to be a good teacher in the American schools. On the basis of her performances before the Congressional Committee and the School Board, the School Board would have been grossly derelict in its responsibilities to the people of Philadelphia if it had not dismissed her. Here is a school teacher who, although supposed to be the very personification of American ideals, defies Congress, insults the School Board, berates democracy, taunts officials and workers in American government, refuses to give testimony that would help this government to fight its mortal enemy in a war of survival, suggests to her pupils that it is desirable not to cooperate with a branch of the United States Government—does all

this in an arrogant, contemptuous, derisive, insolent, rude, scorning manner—and then, six years later, she is restored to the position she has tarnished by her conduct. By that action Congress is rebuffed, the School Board is condemned, the Superintendent of Schools is humiliated, and, in addition, the person responsible for this utterly incredulous situation, may make claim for wages unpaid during the time of her suspension. This is indeed incredulous and baffling to the law, as well as to the taxpayers.

I am in total accord with my brother EAGEN who says: "I emphatically dissent!".

---

DISSENTING OPINION BY MR. JUSTICE EAGEN:

I emphatically dissent!

I agree with the legal correctness of *Slochower v. Board of Higher Education of New York City*, 350 U. S. 549 (1956), but the facts herein are not comparable. If a school board, because of a provision in a city charter, were compelled to summarily dismiss any employee, who refused to testify or answer before a congressional committee, and was consequently thereby denied the right to exercise its sound discretion with respect to the employee's continued employment even though it was determined he or she was completely competent, of course that would be wrong and legally unjustified. That was the Slochower case, but it is not the case of Goldie Watson.

An examination of the record (the notice of suspension; the statement of charges; the testimony before the members of the sub-committee of the House Un-American Activities Committee; and, the testimony before the Board of Education) clearly discloses that

Mrs. Watson was not dismissed because of her failure to answer questions bearing on her loyalty, but rather was it because of what she did say and the manner in which she said it that justifiably led to the conclusion by the Superintendent of Schools that her demeanor bordered on insolence and disclosed incompetency in unmistakable terms. This is not a case of a school teacher suffering dismissal or being declared incompetent merely because she saw fit to exercise her constitutional privileges of refusing to answer. No, this is a situation wherein her public employer, after a full hearing, determined that she was unfit to teach in the community because she clearly evidenced a settled contempt, a blatant disrespect and an arrogant disregard for a duly constituted congressional committee and the important functions it sought to perform.

Let us see how these unfortunate traits of attitude are manifested by the minutes of the sub-committee. She was asked ten questions. She gave responsive answers to three: her name, address, and a brief résumé of her schooling and educational background. When asked if she had ever been a member of the Communist Party, she replied: "Mr. Kunzig, I ask your first questions to be completely identified before this committee. I will not answer any other question I am asked about membership in organizations, associations, societies, people I have met with, or anything else." When advised by the sub-committee of her rights under the Fifth Amendment, she declined to invoke it. In reply to the same question asked again, she said: "I said that I would not answer the question, and that it is a violation of my Constitutional rights for you to bring me here and attempt to compel me to answer questions about my associations, memberships, conferences, or speeches." (Note: "conferences" and

"speeches," both volunteered). Not having availed herself of the privilege against self-incrimination, she was directed to answer and she countered: "I refuse to answer on the basis of my first statement." Next question—"Mr. Kunzig: Did you ever attend a Communist school or a school for instruction of Communist teachers in New York State? Mrs. Watson: *Mr. Kunzig, I have intimated that I am not going to answer your questions. . . ."* When directed to answer, she said: *"I will not answer"* . . . *"I refuse to answer."*[1] These questions and answers are, in the minutes, interspersed with repeated references to the fact that the witness was, during it all, constantly consulting with her counsel. Finally, she "took the First." "Mr. Kunzig: Have you ever attended any Communist instruction school at any place? Mrs. Watson: Mr. Kunzig, I refuse to answer, specifically on the basis of my rights as guaranteed by the First Amendment to the Constitution. . . . I refuse to answer on the basis of the First Amendment." Mr. Kunzig then asked that "the record show that in voice and tone the witness has emphasized the use of the words 'First Amendment.'"

Later in the proceedings she is thusly advised by a committee member: "Mr. Scherer: Of course, I think it is fair to tell the witness—evidently, she already has been told by her counsel—that the manner in which you answered the questions this morning clearly indicates that you are in contempt of the Congress." After consulting with counsel, she replied: "I have been advised by my counsel of the risks and the dangers that I run by taking this position. I still take the risks and the dangers because this position is very sacred to me." Following which, when asked if she had taken the loyalty oath, she said: "I will not answer that ques-

---

[1] Emphasis throughout supplied.

tion." (She later stated that it was a matter of public record that she had taken it.)

That's Goldie Watson as she was before the sub-committee in Washington. But she returns to the scene in person in answer to the charges of her Super-intendent at the board hearing. Now she explains, at length, the reasons that prompted her so to act. Now especially does she mirror traits of attitude toward the sub-committee that lead undeviatingly to the conclu-sion that she is, as charged, unfit to teach in the Com-monwealth's public school system. This is she: "Since the inception of the Committee in 1938 under the Chair-manship of Martin Dies, I had been of the opinion that this wasn't a legislative committee concerned with investigating and then presenting laws; rather that it was an inquisitorial committee and that it was violating the First Amendment to the Constitution." Referring to visits made to her before the hearing by committee investigators and specifically to requests by the latter to identify other people as communists, she said: "I told them that I have had a rule for twenty-two and a half years, that when a pupil walks to my desk he says I; that nothing would make me cooperate with the Com-mittee. *I gave them a breakdown of what I thought about the Committee and its violation of all Americans' rights and its dangers particularly to Negro Americans, and that under no circumstances would I cooperate with them.*" She then says that she "tried to convince" Mr. Fuoss (a committee worker) "of what real Ameri-canism was. . . . Never has this Committee gone into any community and talked about un-Americanism as it affected Negroes. And therefore to me it wasn't a committee really concerned with un-Americanism; that it was a committee that was an inquisition; and that the individual members of the Committee used the Committee as a political football to gain glory and

prestige in America . . . All my life I have dedicated myself to Negro children. I have attempted to convince them that this was *a country in which we could have ultimate real freedom.* . . . And it would have been the lowest type of moral courage and morals for me to have permitted myself to become a stool-pigeon and an informer because I had been informed on. I wouldn't do it. I could not have returned to my classroom under those circumstances. So that when I appeared before the Committee that was my other reason. . . . When I walked into that room I knew that no power, no power on God's earth could make me become a part of something that I thought was wrong; could make me show my boys and girls that I held the Constitution in contempt. Because for me to have participated in that inquisitorial investigation, to me, would have been showing that I did not believe in the Constitution. . . . I invoked the First Amendment, but I recognize very clearly the position of those people who invoked the Fifth. . . . And I say to you, gentlemen, that if the First Amendment no longer means anything, if my right to test this Amendment is a crime, we have reached a terrible state in America. *Democracy is running down the drain.* And Negro Americans will be able to achieve nothing in such an atmosphere."

This speech, which the board had before it when it deliberated upon Mrs. Watson's fate as a school teacher, is "too much"! At the very least, it is *enough,* in my estimation, to sustain a finding such as was arrived at. The District Superintendent, the Board, the Pennsylvania Superintendent of Public Instruction, the lower court—all are agreed that Mrs. Watson is "incompetent" within the meaning of Section 1122 of the Public School Code. But the majority of my colleagues would return her to her job by ordering her reinstatement.

I have stated that the charges against her were based on her behavior, her *conduct* before the committee

and that the latter evidenced a contumacious attitude towards its purposes and processes. Her notice of suspension reads in part as follows: ". . . The reason for your suspension is that you have shown a lack of fitness to be a teacher in that you have displayed *conduct* unbecoming your professional status as a teacher." The Statement of Charges declared that: ". . . Her *conduct* before the Sub-Committee of the House Committee on Un-American Activities is incompatible with her status as a professional employe in the Philadelphia public schools. . . . She showed *by her conduct* a lack of professional fitness to be a teacher. *Her conduct* makes her incompetent to continue in the service of the Philadelphia public schools,. . . ." Upon cross-examination of the Superintendent of Schools who suspended her and preferred the charges, Mrs. Watson's attorney unsuccessfully attempted to show that her refusal to answer was the sole cause of her dismissal: "BY MR. DORFMAN: Q. Dr. Hoyer, you testified that the only real reason you suspended her was because she refused to answer these questions on February 17; is that correct? A. On the basis of her *appearance* before the Committee *and her action* there, yes. . . . MR. DORFMAN: Q. I just want to narrow it down. This was the only reason; is that correct? A. Her *appearance* before that Committee *and her reaction* to the Committee was the basis for the charges." In answer to an earlier question by Mr. Soken who asked: "Q. Doctor, are there any other respects in which you consider Mrs. Watson's conduct before the Committee as constituting unprofessional conduct?", the Superintendent replied: "Well, *I considered Mrs. Watson's* BEHAVIOR *before the Committee of Congress to border on insolence.* And that also entered into my consideration at the time this decision of mine was made." The basis of the charges, then, encompasses far more than a school teacher's legitimate exercise of a constitutional

privilege. She has told the world and the children entrusted to her care what she thought of this subcommittee and has assigned her reasons, which I consider palpably weak, for her refusal to testify. Are those who, under subpoena, go to Washington to testify before duly constituted congressional bodies but who, instead, put on a show of contempt for Congress, are they thereby to become "untouchables"? Due Process? She had it! She received notice of suspension. She was afforded a statement of charges. She was given time to prepare for a public hearing. She appeared at that hearing in person and through counsel. Her attorney exercised the right of cross-examination. She testified, briefly, on direct. She then made a prolonged, uninterrupted statement that covers seven pages in the record before us. She appealed to the Pennsylvania Superintendent of Public Instruction. She appealed from there to the common pleas Court. She was anything but railroaded to her destination of discharge by the board. Her rights were at all times respected.

With the record as my guide, I vehemently regret the reinstatement that is promised.

In conclusion, I would but reiterate that I consider *Slochower v. Board of Higher Education of New York City*, supra, to have (1) been correctly decided, but, (2) absolutely no pertinence, relevance or control vis-a-vis the instant case. It is distinguishable on many very important grounds: See *Nelson v. County of Los Angeles*, 362 U.S. 1 (1960). The City Charter there provided for automatic, summary dismissal. By it a discharge from employment, the conditions existing, was inevitable, made mandatory and, therefore, lacking in an allowance of discretion to the proper supervisory officials and in adequate protective procedures. Again, that is not this case.

Mr. Justice BELL joins in this dissenting opinion.