**FRANKLIN LIFE INSURANCE COMPANY, Plaintiff,**

v.

**Mary E. BIENIEK, and Sewickley Savings & Loan Association, Defendants.**

**Civ. A. No. 60–183.**

United States District Court
W. D. Pennsylvania.

Nov. 29, 1961.

Thomas W. Neely, Jr., Pittsburgh, Pa., for defendant Sewickley Savings & Loan Ass'n.

Wilbur F. Galbraith, Pittsburgh, Pa., and John F. Roney, Washington, Pa., for defendant Mary E. Bieniek.

Gilbert Helwig, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff Franklin Life Insurance Co.

DUMBAULD, District Judge.

This is a non-jury diversity case. This opinion shall be deemed to embody findings of fact and conclusions of law in accordance with Rule 52, F.R.Civ.P., 28 U.S.C.A. We also adopt, as sustained by the record, the sixteen (16) numbered

findings of fact requested by plaintiff. Plaintiff insurance company seeks to cancel a life insurance policy, after the death of the insured on May 4, 1959, on the ground of alleged fraudulent representations in the application. The law of Pennsylvania is that in the case of representations (as distinguished from warranties) there must be (1) falsity (2) materiality and (3) knowledge of falsity or other bad faith on the part of applicant. Allstate Ins. Co. v. Stinger, 400 Pa. 533, 541, 163 A.2d 74 (1960); Evans v. Penn Mutual, 322 Pa. 547, 553, 560, 186 A. 133 (1936). Thus if a patient has cancer but has not been told by the physician there is no bad faith. Burton v. Pacific Mutual Ins. Co., 368 Pa. 613, 615–616, 84 A.2d 310 (1951).

Here, however, we find, the insured was told by his physician the nature of his heart condition, given medicine to take, and advised to find a job involving lighter work (which he did). This appears indisputably from the testimony of Dr. John Hibbs, a highly reputable heart specialist of Fayette County. (Tr. 5–11). Defendants' evidence goes merely to the fact that the insured did continue to work, and never complained or had to stop or slow down, so far as the witness noticed.

■ The statements of the insured in the application were plainly (1) false (2) material and (3) made with knowledge of their falsity on the part of the insured.

The insured was referred to the care of Dr. Hibbs in 1954, at which time the insured was in the Uniontown Hospital for over ten days. Dr. Hibbs continued to treat him until the end of June, 1957.

In part II of the application, under date of March 13, 1958, the insured certified that his answers were correctly recorded to twenty-four (24) questions concerning his health. No. 7 ("When did you last consult a physician or surgeon and for what?") was answered that in 1956 he consulted Dr. J. R. Carothers of Smock for a cold. Nothing was said about the treatments by Dr. Hibbs as late as 1957.

Question 9 as to pain in the chest, or other forms of heart disease, was answered "No." This is in conflict with the testimony of Dr. Hibbs.

The insured's negative answer to Question 16 as to electrocardiograms likewise conflicts with the medical records.

His denial in answer to Question 18 of ever having been "under observation or treatment in any hospital" is clearly false.

Question 19 as to absence from work is also possibly answered falsely, though it is possible that his hospitalization may have coincided with a miners' holiday or period of unemployment.

The answer to Question 20 ("Have you now any disease, ailment * * *") may also be viewed with skepticism.

Question 22 was "Have you within 5 years consulted any physician not included in any of above answered?" Here the answer is "Yes", overwritten over a first answer "No". This answer is elaborated in item No. 24, showing consultation of "Dr. Robinson, Uniontown, Pa." in 1946 for "Amputating distal joint R[igh]t Index Finger." This answer is also clearly false, in that it omitted mention of Dr. Hibbs.

Indeed, the erroneous nature of the answer to Questions 22 and 24 is so clear that we believe it put the company on notice so that it should have made further inquiry, which would doubtless have disclosed the data on which it now relies to cancel the policy.

■ The question called for the names of physicians consulted "within 5 years". The answer was dated March 13, 1958. It referred to an amputation in *1946*. The question called for information concerning the period March 13, 1953— March 13, 1958. The answer was patently unresponsive. This showed either that the insured misunderstood the question or was answering evasively. In either case we think the company was put on notice of irregularity. When it failed to make appropriate inquiry, but chose instead to rely on the medical examination made by Dr. P. M. Haver on March 13,

1958, and the agent's confidential report, and proceeded to issue the policy, it waived the matter of misrepresentations in the application. Continental American Life Ins. Co. of Wilmington, Del. v. Fritsche, 37 F.Supp. 1, 2 (E.D.Pa.1941).

It is possible, but we do not pause to investigate the matter, which is somewhat unclear on the present record, that the insurance company may have been somewhat lax in its investigation by reason of the fact that this policy was issued to insure a mortgage due to the Sewickley Savings & Loan Association which has one hundred seventy-four (174) such policies outstanding in its favor, involving premiums of about $14,000 yearly. The Association paid the first premium of $130.60 on April 4, 1958, and when the insured died it had paid premiums amounting to $261.20, some of which may have been recouped out of payments on the mortgage. (See affidavit of Eugene McEnteer, President of the Association, verified November 9, 1961).

In view of our conclusion, we need not consider another interesting point raised by insured's widow. The policy became effective, according to its terms, on March 13, 1958. (At another place it is dated March 21, 1958. We do not have in the record the original policy, or proof as to the date of its delivery to the Sewickley Savings & Loan Association.) This suit was filed on March 14, 1960, and summons was served on the widow on March 23, 1960. Had the policy become incontestable by virtue of a provision therein that "After two years from date of issue this Policy shall be incontestable"?

March 13, 1960, was a Sunday. If we were dealing with a statute of limitations, the suit would be timely. The same would be true of an ordinary contract provision. Breen v. Rhode Island Ins. Co., 352 Pa. 217, 221, 42 A.2d 556 (1945). But this is a policy provision, to be construed against the company. Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mutual Ins. Co., 385 Pa. 394, 397, 123 A.2d 413, 59 A.L.R.2d 546 (1956). (This rule applies, even though State law requires inclusion of such a provision in the policy. 40 P.S. § 510 (c). The requirement does not forbid elaboration of details, it merely requires inclusion "in substance" of the incontestability clause.) If such a clause, in order to be given effect, necessitated filing suit, it might be considered as incorporating by reference the forensic rules regarding computation of time. Rule 6 (a) F.R.Civ.P. But "incontestability" may refer also to matters of defense, and could be interpreted as meaning that defenses should become extinguished and cease to be valid by the mere expiration of the two year period. The clause could thus be operative without need of resort to the courts and their rules regarding the computation of time. The point is an interesting one, but we need do no more than mention it in view of the decision we have reached on other grounds.

## Order.

And Now, to wit, this 29th day of November, 1961, it is ordered, adjudged, decreed, and finally determined that the complaint herein be and the same is hereby dismissed, plaintiff to pay the costs.