ALYCE ROZIER, Plaintiff-Appellant, *v.* ST. MARY'S HOSPITAL *et al.*,
Defendants-Appellees.

Fifth District No. 77-470

Opinion filed September 10, 1980.—Rehearing denied October 8, 1980.

HARRISON, J., dissenting.

Norton, Bonifield & Associates, of Belleville, and Edward J. Kionka, of Columbia (Jerald J. Bonifield and Edward J. Kionka, of counsel), for appellant.

G. Keith Phoenix and Steven P. Sanders, both of Coburn, Croft, Shepherd, Herzog & Putzell, of St. Louis, Missouri, for appellees.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Plaintiff, Alyce Rozier, filed a complaint alleging she was fired from her job at defendant St. Mary's Hospital (Hospital) in retaliation for report-

ing incidents which occurred there to a local newspaper. The circuit court of St. Clair County granted defendants' motion for summary judgment. We affirm.

Plaintiff's appeal concerns only the first two counts of her six-count final complaint. In her complaint she alleges that on or about December 23, 1974, she witnessed "various abuses and improper conduct by other employees of the hospital, directed toward the patients for which the plaintiff had responsibility." She reported the incidents to her superiors, who "took no action." On the following day, an article in a local newspaper described the incidents she witnessed. Plaintiff alleges she was accused of complicity regarding the article. The complaint does not allege the accusations were false. Rather, she states, "even if true," she was lawfully invoking her first amendment right of free speech. That same date, she submitted to a polygraph examination, following which she was immediately discharged. Her termination was, she alleges, "intentional, malicious, and was calculated to cause harm, injury and damage to plaintiff." Plaintiff sought money damages for lost wages and other injuries.

Defendants moved for summary judgment based on certain exhibits and the discovery depositions of Ms. Rozier, defendant hospital administrator, Carl G. Jaeger, and defendant hospital director of nursing, Rosemary Gallego. Ms. Rozier testified in her deposition that she had not told anyone outside the Hospital of the December 23 incidents. She specifically denied relating those matters to a taxi driver and a neighbor and denied telling Ms. Gallego that she had done so. She admitted having spoken to someone from a newspaper, but only after she had been fired. She testified both the Hospital and good general nursing practice required preservation of patients' confidentiality, including matters relating to their visitors. She testified that Mr. Jaeger had told her he had been informed that a hospital employee had given the newspaper the information for the December 24 story. When Ms. Rozier investigated, a newspaper employee told her that an anonymous telephone caller supplied the information. Ms. Rozier related that she had maintained her innocence during her December 24 polygraph examination, which she had flunked, the failure of which had resulted in her firing. She testified she had no employment contract with the Hospital and had not been promised any specific duration of employment.

Ms. Rozier's testimony reveals little about the December 23 incidents. She testified as follows:

"Q. Did you tell them anything about a patient being allegedly sexually assaulted here in the hospital?

A. No, I did not.

Q. Did you tell them anything about any alleged intoxication of any of the employees of the hospital?

\* \* \*

A. Yes, I did.

Q. Okay. When was that?

A. In January.

\* \* \*

A. \* \* \* And I told him, I said, 'I've lost my job, I was fired' and I didn't know nothing about anybody getting sexually molested. \* \* \*"

Beyond the above answers the transcript of her discovery deposition does not suggest the nature of the December 23 incidents.

The manner in which Ms. Gallego first learned of the December 23 incidents does not appear of record. Ms. Gallego testified in her deposition that she had arrived at the hospital where she had met Ms. Rozier and the head of personnel, apparently on the night of December 23 while the 3 to 11 p.m. shift including Ms. Rozier was still on duty. Ms. Gallego testified that the next day all staff members on that shift were questioned in an effort to find out who had leaked information to the newspaper. All took polygraph tests. Ms. Rozier and the examiner both reported that Ms. Rozier had failed the test. According to Ms. Gallego, Ms. Rozier denied having contacted the newspaper but admitted discussing the incidents with a taxi driver and her neighbor. Ms. Gallego "laid off" Ms. Rozier, who threatened more adverse publicity and departed. Later a second newspaper article appeared referring to a reporter's discussion with Ms. Rozier.

Mr. Jaeger testified in deposition that Ms. Rozier had had no employment contract and could have been fired with or without cause. He stated Ms. Rozier had been fired because she had told him she had told no one of the December 23 incidents and the polygraph test had shown she was lying; thus, she was fired for lying and for revealing confidential information.

Mr. Jaeger testified he had fired two hospital heads of departments because of the December 23 incidents. One, the head of security, had a conversation with a female patient in her room which involved the subject of oral sex. The other, the head of personnel, was in the same patient's room after regular visiting hours in an intoxicated condition and was removed from the room by Ms. Rozier. Mr. Jaeger testified he first learned of the incidents at approximately 9:30 a.m. December 24 from Ms. Gallego, at which time he sent his assistant to interview the two patients in the room. He received the above account of the incidents from his assistant. After Mr. Jaeger fired the two department heads, a police sergeant came to the Hospital and asked to speak to the patient involved, but she declined to see him or complain.

Defendants moved for summary judgment on the counts appealed on the basis that Ms. Rozier was not employed for any specific duration and that the relationship between Ms. Rozier and the Hospital was terminable

at will without cause or justification. The circuit court, granting defendants' motion, held no cause of action existed in Illinois for "retaliatory discharge" and there was no breach of contract as Ms. Rozier's employment was not for any specific duration.

■■ Plaintiff urges that subsequent to summary judgment in the instant case a cause of action for retaliatory discharge has been recognized in Illinois. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) She maintains defendants forced her to "choose between (1) retention of her job and (2) remaining silent as to alleged abuses and improprieties which were directed at patients for which she had direct responsibilities." We note that in her deposition testimony the plaintiff stated that she did in fact remain silent as to those matters. Accordingly, it readily can be seen that if her deposition testimony in this regard was true her firing was merely an exercise of an employer's judgment and no significant public policy issues are involved. In general, in the absence of a contract of employment of some specified duration, an employer may discharge an employee whenever and for whatever cause he chooses without incurring liability. (*Kelsay v. Motorola; Roemer v. Zurich Insurance Co.* (1975), 25 Ill. App. 3d 606, 323 N.E.2d 582.) Plaintiff under the general rule would have no cause of action based on her discharge. Accordingly, we assume for the sake of argument, as plaintiff does, that she did in fact divulge the above-mentioned information.

Summary judgment was proper "if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Ill. Rev. Stat. 1977, ch. 110, par. 57(3).) The parties agree the dispositive issue is whether a cause of action was presented here. The parties devote much of their argument to the issue of how broadly we should construe the decision of *Kelsay v. Motorola.* While recognizing the general rule that an at-will employee may be terminated with or without cause at any time, the supreme court in *Kelsay* recognized a cause of action for retaliatory discharge where the plaintiff was fired for making a claim under the Workmen's Compensation Act. (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*) Plaintiff urges that "[this] court should read the *Kelsay* decision as controlling in establishing a public policy exception to the termination at-will rule in both statutory and non-statutory contexts." We do not view *Kelsay* so broadly. We are guided in our interpretation by the *Kelsay* majority which stated:

> "The Workmen's Compensation Act, in light of its beneficent purpose, is a humane law of a remedial nature. [Citation.] It provides for efficient remedies for and protection of employees and, as such, promotes the general welfare of this State. Consequently, its enactment by the legislature was in furtherance of sound public

policy. [Citation.] We are convinced *that to uphold and implement this public policy* a cause of action should exist for retaliatory discharge.

＊　＊　＊

We are not convinced that an employer's otherwise absolute power to terminate an employee at will should prevail when that power is exercised to prevent the employee *from asserting his statutory rights under the Workmen's Compensation Act*. As we have noted, the legislature enacted the workmen's compensation law as a comprehensive scheme to provide for efficient and expeditious remedies for injured employees. *This scheme* would be seriously undermined if employers were permitted to abuse their power to terminate by threatening to discharge employees for seeking compensation under the Act." (Emphasis added.) 74 Ill. 2d 172, 181-82, 384 N.E.2d 353, 357.

In our view *Kelsay* was a decision of narrow applicability intended only to promote the public policy furthered by the Workmen's Compensation Act. Few, if any, considerations of public policy justify a deviation from the employer's general privilege to fire an at-will employee, with or without just cause. We note that in *Kelsay* our supreme court carefully distinguished and declined to overrule *Teale v. Sears, Roebuck & Co.* (1976), 66 Ill. 2d 1, 359 N.E.2d 473. In *Teale* the supreme court held that a discharged employee had no cause of action for compensatory and punitive damages when he was fired in violation of what was referred to as the "Age Discrimination Act" (Ill. Rev. Stat. 1975, ch. 48, pars. 881 to 887), despite the legislature's expression of the public policy considerations underlying the Act. (See Ill. Rev. Stat. 1975, ch. 48, par. 881.) We note additionally the recent opinion of *Palmateer v. International Harvester Co.* (1980), 85 Ill. App. 3d 50, 406 N.E.2d 595. There, the court held plaintiff had stated no cause of action for wrongful discharge where he alleged he was fired for cooperating with a law enforcement agency in a criminal investigation and prosecution directed against a fellow employee. Citing *Kelsay*, the *Palmateer* court stated its reluctance to expand any tort absent cogent reasons for the expansion, and its belief that such reasons did not exist in that case.

■■ Accordingly, we are of the opinion that the cause of action recognized in *Kelsay* is and should be limited to discharge in retaliation for the employee's exercise of his rights under the Workmen's Compensation Act. Obviously, the employer who discharges an employee for a mixture of just and unjust reasons might, if actions for retaliatory discharge were generally permitted, be required to respond in damages. The more insidious danger, recognized by Justice Underwood in his dissent in *Kelsay*, is that an

employer may justly discharge an employee only at the risk of being compelled to *defend* a suit for retaliatory discharge. If such a cause of action generally could be maintained, employers, particularly those in small businesses, would be thrust into economic dilemma by every employment decision. Expansion of the *Kelsay* rule carries the danger of transforming at-will employment into life tenure regardless of work performance.

Our disinclination to expand *Kelsay* serves to protect employees as well as employers. The question is, essentially, whether we imply the existence of contract rights to continued employment in the absence of express contract. In the absence of an employment contract, the counterpart of the employer's privilege to terminate at will is the privilege of the employee to do the same. As the court in *Geary v. United States Steel Corp.* (1974), 456 Pa. 171, 319 A.2d 174, recognized, employees have a strong interest in maintaining that privilege free from threat of suit, lest employers be supplied with a new weapon with which to harass key employees wishing to change jobs. Thus, the rights of employer and employee to decline to create conditions for termination benefit both. We would not benefit the parties or the public by diminishing those rights.

In declining to expand the cause of action recognized in *Kelsay*, we are aware that limited causes of action by at-will employees for retaliatory discharge have been permitted in other jurisdictions. (See *Nees v. Hocks* (1975), 272 Or. 210, 536 P.2d 512 (plaintiff fired for serving on a jury); *Petermann v. International Brotherhood of Teamsters* (1959), 174 Cal. App. 2d 184, 344 P.2d 25 (plaintiff fired for refusing to commit perjury); *Monge v. Beebe Rubber Co.* (1974), 114 N.H. 130, 316 A.2d 549 (plaintiff fired for refusing to date foreman).) Disagreement among the various jurisdictions readily appears, however, and even strong public policy considerations have been rejected as a basis for a cause of action for retaliatory discharge. See *Percival v. General Motors Corp.* (E. D. Mo. 1975), 400 F. Supp. 1322, *aff'd* (8th Cir. 1976), 539 F.2d 1126 (plaintiff fired for, *inter alia*, correcting employer's "misleading" public information); *Geary v. United States Steel* (plaintiff fired for his efforts to withdraw a dangerous product from the market).

■■ Even if we recognized a cause of action for retaliatory discharge beyond the facts in *Kelsay*, we are of the opinion that the discharged employee's action should not be allowed where, as here, plaintiff's own discovery deposition reveals a legitimate reason for her discharge. Plaintiff urges she was fired for showing concern for patients under her care and for exercising her first amendment right to free speech. Yet, her own testimony shows she denied telling anyone about the December 23 incidents. She then failed a polygraph test when questioned about that denial. On these

uncontradicted facts we believe plaintiff's employer was justified in concluding that plaintiff had lied with respect to job-related matters and in terminating her employment on that basis. *Cf. Geary v. United States Steel* (1974), 456 Pa. 171, 184-85, 319 A.2d 174, 180.

We also find that no basis appears for plaintiff's claim that her first and fourteenth amendment rights to free speech were violated, as she strongly urges in her brief. Defendants answered that plaintiff's termination involved no "State action," an assertion we find supported in Mr. Jaeger's testimony that the Hospital is private and in his uncontradicted testimony regarding Hospital fund sources and employment decisions. Accordingly, argued defendants, plaintiff's free speech cases involving employees fired from State or public school systems were inapposite. (See, *e.g., Greminger v. Seaborne* (8th Cir. 1978), 584 F.2d 275.) Plaintiff's reply brief cites neither authority on point nor facts upon which we might find State action was involved. She urges, however, that State action is not requisite to her first and fourteenth amendment claims. But we find the point well settled to the contrary. See *Shelley v. Kraemer* (1947), 334 U.S. 1, 13, 92 L. Ed. 1161, 1180, 68 S. Ct. 836, 842.

■■ Plaintiff argues alternatively: "Surely neither tort actions nor first amendment rights are available only to employees whose employers are engaged in State action." Without doubt plaintiff's right to divulge information to her neighbor, a taxi driver, or the Metro East Journal, was protected by the first and fourteenth amendments. It is equally without doubt that plaintiff's right to continued private-sector employment was not so protected. The proscribed abridgment of individual rights is, by the express language of the amendments concerned, limited to the acts and actions of congress and the States. We accordingly must conclude that no abridgment of plaintiff's right of free speech is involved in this case. We note plaintiff alleged in counts V and VI of her complaint that State action was involved in her firing. The trial court dismissed those counts on the sole ground that no State action was involved, a ruling plaintiff declined to appeal.

Finally, plaintiff's allegations in her complaint that she "reported the incidents to her superiors" who "took no action thereon" are, in light of her deposition testimony, without substance. The Metro East Journal article which allegedly resulted in her firing appeared on the day following the late-night incidents. The Hospital could not have failed in its duty to act on any report Ms. Rozier may have made in so short a time. Moreover, Mr. Jaeger's testimony that he promptly investigated and dismissed the two department heads involved before the police arrived is uncontradicted. However, we need not determine whether those facts require summary judgment for defendants in view of our determination that *Kelsay* is not applicable in this case.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KASSERMAN, J., concurs.

Mr. JUSTICE HARRISON, dissenting:

I respectfully dissent.

The threshold consideration is whether this is a proper case for summary judgment. Because the facts surrounding the subject incident and the nature of that information as confidential or constitutionally protected free speech are partly undeveloped and vigorously disputed by the parties, I believe summary judgment was improperly granted in this case.

Section 57 of the Civil Practice Act defines the procedure for granting summary judgment as follows:

> "The judgment sought shall be rendered forthwith if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1977, ch. 110, par. 57.)

It is well settled that summary judgment should not be entered where the pleadings present triable issues of fact.

> "Summary judgment provides a means of disposing of cases with dispatch, but it is a drastic method and should only be allowed when the right of the party to invoke that drastic method is free from doubt. Summary judgment must not be used to preempt the right to a trial by jury or the right to fully present the factual basis for a case where a material dispute may exist. In viewing the trial court's granting of summary judgment, we must consider all grounds urged and facts revealed in that court to determine if a genuine issue as to material fact remained to be determined by a jury and whether plaintiff was entitled to summary judgment as a matter of law. [Citation.]" (*Interlake, Inc. v. Harris Trust & Savings Bank* (1978), 57 Ill. App. 3d 524, 526, 373 N.E.2d 413.)

And it is to be further remembered that "even if there is no dispute in the evidence, if fair-minded persons would draw different conclusions from the evidence, then it becomes the province of the jury to draw that conclusion which to them seems most reasonable." *Borus v. Yellow Cab Co.* (1977), 52 Ill. App. 3d 194, 198, 367 N.E.2d 277.

The parties agree that there was a contract for an indefinite period of time, a contract terminable at will. And the majority correctly cites the

general rule that under such a contract, an employer can terminate his employee at any time with or without cause. However, the majority acknowledges, as it must, that this timeworn rule is not absolute. Causes of action for retaliatory discharge have evolved as public policy exceptions to the general contract terminable at will rule.

Some of our sister States have recognized such a cause of action. The first was California in the case of *Petermann v. Teamsters Local 396* (1959), 174 Cal. App. 2d 184, 344 P.2d 25. There the union-employer requested plaintiff-employee to give false testimony before a State legislative committee. However, plaintiff testified truthfully and was immediately discharged. The court recognized the rule of contracts terminable at will, but noted that "the right to discharge an employee under such a contract may be limited by statute [citations] or by considerations of public policy." (174 Cal. App. 2d 184, 188, 344 P.2d 25, 27.) While the court stated that "public policy" was not subject to precise definition, what is intended is " ' *"that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good * * *."* ' [Citation]." 174 Cal. App. 2d 184, 188, 344 P.2d 25, 27.

The statutory and public policies being protected in *Petermann* were the restrictrions against solicitation and commission of perjury. The court explained the reasons why allegations of sufficient facts to show improper discharge were enough to support a cause of action.

"It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee, whether the employment be for a designated or unspecified duration, on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. The threat of criminal prosecution would, in many cases, be a sufficient deterrent upon both the employer and employee, the former from soliciting and the latter from committing perjury. However, in order to more fully effectuate the state's declared policy against perjury, the civil law, too, must deny the employer his generally unlimited right to discharge an employee whose employment is for an unspecified duration, when the reason for the dismissal is the employee's refusal to commit perjury. To hold otherwise would be without reason and contrary to the spirit of the law. The public policy of this state as reflected in the penal code sections referred to above would be seriously impaired if it were to be held that one could be discharged by reason of his refusal to commit perjury. To hold that one's continued employment could be made contingent upon his commission of a felonious act at the instance of his employer would be to encourage criminal conduct upon the part of both the employee and employer and would serve to contaminate the honest administration

of public affairs. This is patently contrary to the public welfare. The law must encourage and not discourage truthful testimony. The public policy of this state requires that every impediment, however remote to the above objective, must be struck down when encountered.

Furthermore, plaintiff's allegations that the duration of his employment was for such period as his work was satisfactory; that on October 4, 1955 (the day before the legislative committee hearing), he was informed by Matula that 'his work was highly satisfactory'; that his discharge on the day following the hearing was for 'The purpose of punishing plaintiff for testifying truthfully' and 'for not committing perjury as he had been called upon to do,' raise an issue as to the good faith of the defendants in discharging plaintiff and lay a foundation, if established, for damages for their action. When one, who has been employed for such time as his services are satisfactory, is discharged it is 'well settled that the employer must act in good faith; and, where there is evidence tending to show that the discharge was due to reasons other than dissatisfaction with the services the question is one for the jury.' [Citations.]" 174 Cal. App. 2d 184, 188-89, 344 P.2d 25, 27-28.

The State of Pennsylvania long ago recognized that an employee terminable at will could not be fired simply because of his or her assertion of constitutional rights, for such was a violation of the employee's due process rights. (*Board of Public Education School District v. Watson* (1960), 401 Pa. 62, 70, 163 A.2d 60, 63-64; *Board of Public Education School District v. Intille* (1960), 401 Pa. 1, 21, 163 A.2d 420, 430; see *Slochhower v. Board of Higher Education* (1956), 350 U.S. 551, 559, 100 L. Ed. 692, 701, 76 S. Ct. 637, 641.) The Pennsylvania Supreme Court in *Geary v. United States Steel Corp.* (1974), 456 Pa. 171, 319 A.2d 174, which appellees and the majority cite in their favor, denied plaintiff relief where he was discharged after reporting deficiencies in a company product which was subsequently withdrawn from the market. The court ruled that plaintiff had not demonstrated a specific purpose or intent on the employer's part to cause him harm, cause him to break a law, or to otherwise compromise himself. (456 Pa. 171, 180, 319 A.2d 174, 178.) However, the court limited its holding by saying that it might rule otherwise where the clear mandates of public policy were threatened. 456 Pa. 171, 184-85, 319 A.2d 174, 180.

In the case of *Monge v. Beebe Rubber Co.* (1974), 114 N. H. 130, 316 A.2d 549, an employee discharged because she rejected the sexual advances of her foreman was allowed to recover in contract because the balance of competing interests weighed in her favor.

"In all employment contracts, whether at will or for a definite term, the employer's interest in running his business as he sees fit

must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two. *See* Note, California's Controls On Employer Abuse of Employee Rights, 22 Stanford L.Rev. 1015 (1970). We hold that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not the best interest of the economic system or the public good and constitutes a breach of the employment contract. Frampton v. Central Indiana Gas Co., 297 N.E.2d 425 (Ind. 1973); *see* Petermann v. International Brotherhood, 174 Cal.App.2d 184, 189, 344 P.2d 25, 27 (1959); Blades, Employment At Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Column. L. Rev. 1404, 1418 (1967). Such a rule affords the employee a certain stability of employment and does not interfere with the employer's normal exercise of his right to discharge, which is necessary to permit him to operate his business efficiently and profitably." 114 N. H. 130, 133, 316 A.2d 549, 551-52.

Such "motivational infringement upon public policy" has been acknowledged by the Idaho Supreme Court to be an exception to the employment at will rule. (*Jackson v. Minidoka Irrigation District* (1977), 98 Idaho 330, 334, 563 P.2d 54, 58.) Likewise, in *Nees v. Hocks* (1975), 272 Or. 210, 218, 536 P.2d 512, 515 (*en banc*) the Supreme Court of Oregon held "that there can be circumstances in which an employer discharges an employee for such a socially undesirable motive that the employer must respond in damages for any injury done." The court held that the plaintiff-employee should be awarded compensatory damages for being discharged because she undertook jury duty against the wishes of her employer. The court noted the Oregon constitutional and statutory sections providing for jury trials in both civil and criminal cases and invoked "substantial 'societal interests' in having citizens serve on juries.":

"These actions by the people, the legislature and the courts clearly indicate that the jury system and jury duty are regarded as high on the scale of American institutions and citizen obligations. If an employer were permitted with impunity to discharge an employee for fulfilling her obligation of jury duty, the jury system would be adversely affected. The will of the community would be thwarted. For these reasons we hold that the defendants are liable for discharging plaintiff because she served on the jury." (272 Or. 210, 219, 536 P.2d 512, 516.)

It should be pointed out that Illinois has held "[i]f an employer discharges an employee who has been called to jury service and is required on that account to absent himself from his employment, there is no question that such conduct on the part of the employer would be contemptuous. People

v. Huggins, 258 Ill. App. 238 (First Dist. 1930)." *People v. Vitucci* (1964), 49 Ill. App. 2d 171, 172, 199 N.E.2d 78.

The United States Supreme Court recognized that a private cause of action for damages emanating from a constitutional violation of the fourth amendment could be entertained in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* (1971), 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999, where the court reiterated that " 'where federally protected rights have been invaded, it has been the rule from the beginning that the courts will be alert to adjust their remedies so as to grant the necessary relief.' [Citations.]" (403 U.S. 388, 392, 29 L. Ed. 2d 619, 624, 91 S. Ct. 1999, 2002.) Acting in furtherance of that philosophy, the court in *Davis v. Passman* (1979), 442 U.S. 228, 60 L. Ed. 2d 846, 99 S. Ct. 2264, held that a congressional aide discharged because of sex discrimination stated a cognizable claim for damages under the due process clause of the fifth amendment of the United States Constitution. Noting that "the judiciary is clearly discernible as the primary means through which these [constitutional] rights may be enforced" (442 U.S. 228, 241, 60 L. Ed. 2d 846, 860, 99 S. Ct. 2264, 2275), the court held that plaintiff stated a cause of action by quoting with approval Chief Justice Marshall in *Marbury v. Madison* (1803), 1 Cranch 137, 163, 2 L. Ed. 60, 69:

> " 'The very essence of civil liberty * * * certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.' " (442 U.S. 228, 242, 60 L. Ed. 2d 846, 860-61, 99 S. Ct. 2264, 2275.)

And just recently, the court in *Carlson v. Green* (1980), 446 U.S. 14, 64 L. Ed. 2d 15, 100 S. Ct. 1468, held that a private right of action for damages arose directly from the eighth amendment of the United States Constitution, notwithstanding that complainant's allegations were also cognizable under the Federal Tort Claims Act, 28 U.S.C. §2680(h) (1976).

The Federal courts have also recognized that an employee cannot be discharged because of the prior exercise of a constitutionally guaranteed right. When a school board dismissed a teacher for writing a letter critical of the board's handling of past bond issues, which was subsequently printed, the Supreme Court in *Pickering v. Board of Education* (1968), 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731, reversed because in balancing the interests of the employee and employer, the employee's constitutional right to free speech protected debate on issues of general public interest. In *Perry v. Sindermann* (1972), 408 U.S. 593, 33 L. Ed. 570, 92 S. Ct. 2694, the Supreme Court held improper the granting of summary judgment in favor of the board of regents, which had fired a teacher for publicly criticizing board policies, saying that the government as employer "may not deny a benefit to a person on a basis that infringes his constitutionally protected

interests—especially, his interest in freedom of speech." (408 U.S. 593, 597, 33 L. Ed. 2d 570, 577, 92 S. Ct. 2694, 2697.) Indeed, the Supreme Court has now delineated the concomitant burdens in such cases involving constitutionally protected activity:

"[O]nce the employee has shown that his constitutionally protected conduct played a 'substantial' role in the employer's decision not to rehire him, the employer is entitled to show 'by a preponderance of the evidence that it would have reached the same decision as to [the employee's] re-employment even in the absence of the protected conduct.' " *Givhan v. Western Line Consolidated School District* (1979), 439 U.S. 410, 416, 58 L.Ed. 2d 619, 625, 99 S. Ct. 693, 697, citing *Mt. Healthy City School District Board of Education v. Doyle* (1977), 429 U.S. 274, 287, 50 L. Ed. 2d 471, 484, 97 S. Ct. 568, 576.

Cases of actionable retaliatory discharge have also arisen where the particular facts involved workmen's compensation claims. In *Frampton v. Central Indiana Gas Co.* (1973), 260 Ind. 249, 297 N.E.2d 425, plaintiff was discharged after she filed an injury claim and received a settlement. The court noted that in order to achieve the expeditious remedy envisioned by statute "and for public policy to be effectuated, the employee must be able to exercise his right in an unfettered fashion without being subject to reprisal." (260 Ind. 249, 251, 297 N.E.2d 425, 427.) Thus the court concluded:

"Retaliatory discharge for filing a workmen's compensation claim is a wrongful, unconscionable act and should be actionable in a court of law.

\* \* \*

[S]uch a discharge would constitute an intentional, wrongful act on the part of the employer for which the injured employee is entitled to be fully compensated in damages. *Of course, the issue of retaliation should be a question for the trier of fact.*" (Emphasis added.) 260 Ind. 249, 252-53, 297 N.E.2d 425, 428.

In *Sventko v. Kroger Co.* (1976), 69 Mich. App. 644, 245 N.W.2d 151, the court was confronted with another discharge subsequent to the filing of a workmen's compensation claim. Stating that the employment at will rule is not absolute and termination is "the most powerful weapon at the disposal of the employer," the court held "that an employer at will is not free to discharge an employee when the reason for the discharge is an intention on the part of the employer to contravene the public policy of this state." 69 Mich. App. 644, 647, 245 N.W.2d 151, 153.

The Illinois Supreme Court also has recognized a cause of action for retaliatory discharge in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353. The case involved an employee who injured her thumb and filed a workmen's compensation claim. She was immediately discharged,

and the claim was eventually settled. Appellees and the majority suggest that this case is limited to its workmen's compensation facts. However, the supreme court stated the issue as follows:

> "First, should this State recognize a cause of action for retaliatory discharge?" (74 Ill. 2d 172, 179.)

The court answered in the affirmative, recognizing a protectible public policy embodied in the Workmen's Compensation Act:

> "The Workmen's Compensation Act, in light of its beneficent purpose, is a humane law of a remedial nature. [Citation.] It provides for efficient remedies for and protection of employees and, as such, promotes the general welfare of this State. Consequently, its enactment by the legislature was in furtherance of sound public policy. [Citation.] We are convinced that to uphold and implement this public policy a cause of action should exist for retaliatory discharge." (74 Ill. 2d 172, 181.)

The court then went on to discuss the implications for that public policy if a cause of action for retaliatory discharge were not sanctioned.

> "We are not convinced that an employer's otherwise absolute power to terminate an employee at will should prevail when that power is exercised to prevent the employee from asserting his statutory rights under the Workmen's Compensation Act. As we have noted, the legislature enacted the workmen's compensation law as a comprehensive scheme to provide for efficient and expeditious remedies for injured employees. This scheme would be seriously undermined if employers were permitted to abuse their power to terminate by threatening to discharge employees for seeking compensation under the Act. We cannot ignore the fact that when faced with such a dilemma many employees, whose common law rights have been supplanted by the Act, would choose to retain their jobs, and thus, in effect, would be left without a remedy either common law or statutory. This result, which effectively relieves the employer of the responsibility expressly placed upon him by the legislature, is untenable and is contrary to the public policy as expressed in the Workmen's Compensation Act. We cannot believe that the legislature, even in the absence of an explicit proscription against retaliatory discharge, intended such a result." 74 Ill. 2d 172, 181-82.

The *Kelsay* case was relied on in *Montague v. George J. London Memorial Hospital* (1979), 78 Ill. App. 3d 298, 396 N.E.2d 1289, to recognize a cause of action for damages as a remedy for an alleged violation of section 5—3 of the Illinois Mental Health Code of 1967, which granted a voluntary admittee to a hospital the right to leave upon five days of written notice of such desire. Acknowledging the public policies expressed in the

Code to be deserving of the same type of protection afforded the policy considerations emanating from the Workmen's Compensation Act and protected in *Kelsay*, the First District Appellate Court held:

> "We find in the public policy expression of concerns for individual liberty and the advancement of society's interests contained in the Mental Health Code an analogous basis for recognizing the right of one who pursues the procedures set forth in section 5—3 to assert a civil action in damages as a remedy for violation of those statutory procedures. To hold otherwise would ignore the underlying public policy, disregard the clear legislative intent, facilitate questionable hospitalizations of those unable to assert for themselves their statutory and constitutional right to liberty, and advise the putative voluntary patient that the statutory assurance of release is transient, if not evanescent." 78 Ill. App. 3d 298, 303.

I recite this litany of cases to demonstrate that the retaliatory discharge exceptions to the general contract terminable at will rule are based on public policy and are, therefore, ever expanding on a case-by-case basis. The majority concludes that "no abridgment of plaintiff's right of free speech is involved in this case," limiting its discussion to the first amendment of the United States Constitution. The majority ignores the implication of appellant's State constitutional rights and the rule that a State constitution can guarantee more expansive rights than the Federal Constitution. (*Pruneyard Shopping Center v. Robins* (1980), 445 U.S. 914, 64 L. Ed. 2d 741, 752, 100 S. Ct. 2035.) The 1970 Illinois Constitution, article I, section 4, guarantees that "all persons may speak, write and publish freely, being responsible for the abuse of that liberty." This constitutional guarantee is not limited expressly to politics or matters of public concern (*Farnsworth v. Tribune Co.* (1969), 43 Ill. 2d 286, 290-91, 253 N.E.2d 408; *McErlean v. Harvey Area Community Organization* (1972), 9 Ill. App. 3d 527, 530, 292 N.E.2d 479), although information about the incidents in question arguably comes within that realm of public interest and concern given special protection under the guarantee of free speech. (*Donahue v. Staunton* (7th Cir. 1972), 471 F.2d 475, 480-81, *cert. denied* (1973), 410 U.S. 955, 35 L. Ed. 2d 687, 93 S. Ct. 1419.) While I believe that under the proper circumstances an individual could make out a submissible case of retaliatory discharge for being terminated in her job as a result of engaging in speech protected by the State or Federal constitutions, I am unable, as should be the majority, to determine whether this is such a case, because this particular litigation is riddled with dispute and necessary evidence has yet to be developed or presented.

The exact nature of the incidents in question is in dispute. Appellee Jaeger stated in deposition that "there was discussion of sex, I think oral sex took place, * * *" by a former hospital head of security with a patient.

However, the depositions of all parties are replete with references to alleged sexual assault and sexual molestation of the patient. Likewise, the circumstances surrounding the drunkenness of the former head of personnel and his actions toward the patient are unclear. No testimony from either of the department heads or the patient is contained in the record.

Moreover, appellees contend that Ms. Rozier did release the aforesaid information to the press and other third parties, in direct violation of Hospital "Personnel Policies" which appellant admitted she had knowledge of and promised to abide by. One of the rules and regulations regarding employee conduct reads as follows:

"Employees have a moral and legal right and obligation to respect the privacy of patients. The attending physician can, and will, discuss the patient's illness or injury with those who have the right to know. A one-word description of a patient's condition: 'fair', 'poor', or 'good', is available at the information desk unless otherwise restricted."

With respect to confidential patient information, the rules and regulations provide: "Hospital employees are prohibited from discussing the treatment or condition of any patient with anyone other than duly authorized hospital personnel in the performance of their duties." I also note that both "revealing confidential information" and "threatening or striking a patient, employee, or visitor" were listed as grounds for employment termination for the first offense under the Hospital's rules and discipline procedure.

However, nowhere else in the personnel policies is "privacy," "confidentiality," or "confidential information" defined. In fact, the rules and regulations state: "Any question concerning * * * the definition of confidential information, must be directed to Administration." Whether the alleged incidents of December 23, 1974, are confidential information is a fundamental issue to be resolved in this case, as is the determination of whether such information is encompassed within "the treatment or condition of any patient * * *." Appellee Jaeger testified that he could not answer hypothetical questions about what was confidential information.

Also there is a dispute as to whether appellant "flunked" the polygraph examination. Neither the testimony of the polygraph examiner nor his report of the results is contained in the record, although such report was marked as a deposition exhibit. Appellee Jaeger did read apparently from the report that "Mrs. Rozier was withholding information and attempting deception. However, Mrs. Rozier steadfastly denied having reported this matter to the news media." But what questions were asked and what deceptive responses, if any, were given remain at issue.

These are all issues of material fact which are in dispute, and it is not at all clear that appellees, as the moving parties, are entitled to judgment as a matter of law. Only after these disputes are resolved can it be decided

whether appellant was engaged in constitutionally protected speech and thereafter whether she has presented a case encompassed within the narrow retaliatory discharge exception to the general terminable at will rule. However, to rule on this record that there are uncontroverted facts which support summary judgment for appellees is erroneous.

Since I would reverse the judgment of the trial court and remand this cause for further proceedings, I dissent.