PAT WITT, Plaintiff-Appellee, *v.* FOREST HOSPITAL, INC., *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 81—2897

Opinion filed May 25, 1983.

Richard H. Hoffman, Glen E. Amundsen, and Victor J. Piekarski, all of Querrey, Harrow, Gulanick & Kennedy, Ltd., of Chicago, for appellants.

Patrick T. Driscoll, Jr., of Chicago (David J. O'Keefe, of counsel), for appellee.

JUSTICE WHITE delivered the opinion of the court:

Plaintiffs, Pat Witt and Sheila Mroczkowski, filed a complaint in the circuit court of Cook County seeking compensatory and punitive damages and injunctive relief against their ex-employer, Forest Hospital, Inc., and Dr. Robert Simon, administrator of the hospital. Each alleged that her employment as a nurse at the hospital had been terminated because she had provided information to the Guardianship and Advocacy Commission (GAC) and that this violated section 34 of the Guardianship and Advocacy Act (Ill. Rev. Stat. 1979, ch. 91½, par. 734). The GAC was permitted to intervene as a plaintiff, and it filed a complaint in intervention. After a bench trial, the trial court entered judgment in favor of the individual plaintiffs, awarded compensatory damages, awarded punitive damages in the amount of $5,000 to each individual plaintiff, and entered an order requiring Forest Hospital to restore them to the positions of employment they held prior to their terminations. Subsequently, the trial court entered an order establishing $2,976 as the amount of compensatory damages due to plaintiff Witt. Coplaintiff Mroczkowski filed a release and satisfaction of judgment and is not involved in this appeal. Defendants, Forest Hospital and Simon, argue on appeal that the trial court's findings that Witt was terminated and that she was penalized, sanctioned or restricted as a consequence of her dealings with the GAC were not supported by the evidence; that the award of compensatory damages to Witt was contrary to the manifest weight of the evidence; that Witt was not entitled to punitive damages; and that the order requiring Witt's reinstatement to her prior position of employment was erroneous. On cross-appeal, Witt contends that the finding of the trial court that she failed to mitigate her damages was erroneous.

Before addressing the factual issues raised by defendants, we must determine whether a nurse whose employment has been terminated by a hospital in violation of section 34 of the Guardianship and Advocacy Act has a private cause of action for retaliatory discharge against the hospital to remedy the violation. Section 34 provides:

> "A person, who in good faith, files a complaint or provides information to the Commission or any division thereof, including private citizens and employees of service providers, shall not be subject to any penalties, sanctions, or restrictions as a consequence of filing the complaint or providing the information." (Ill. Rev. Stat. 1979, ch. 91½, par. 734.)

There is no dispute that Forest Hospital is a "service provider." Thus, if Witt, an employee of Forest Hospital, was penalized, sanctioned or restricted as a consequence of providing information to the

GAC, she is entitled to any protection provided by section 34. Section 34, however, does not specifically authorize a private right of action.

Our supreme court has recognized the tort of retaliatory discharge as "an exception to the general rule that an 'at-will' employment is terminable at any time for any or no cause." (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 128, 421 N.E.2d 876; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 181, 384 N.E.2d 353.) In *Palmateer*, the supreme court established the contours of the tort: "The cause of action is allowed where the public policy is clear, but is denied where it is equally clear that only private interests are at stake." (85 Ill. 2d 124, 131.) In other words, the foundation of the tort lies in the protection of public policy. 85 Ill. 2d 124, 133.

▪ By enacting the Guardianship and Advocacy Act, the General Assembly intended "to create the Guardianship and Advocacy Commission, to safeguard the rights and to provide legal counsel and representation for [the mentally ill and the developmentally disabled] and to create the Office of State Guardian for disabled persons." (See 1978 Ill. Laws 2020, 2028.) And section 34 of the Act clearly establishes that the public policy of this State is to protect employees of service providers, who in good faith, provide information to the GAC. Accordingly, we hold that a nurse whose employment has been terminated by a service provider, because she in good faith provided information to the GAC, has a private cause of action for retaliatory discharge against the service provider. Such an action is necessary to uphold and implement the public policy behind section 34 and the Guardianship and Advocacy Act as a whole. If we were to hold otherwise, the ability of the GAC to safeguard the rights of the mentally ill and the developmentally disabled would be substantially hampered.

Furthermore, we believe that an employee of a service provider is a member of a protected class for whose benefit section 34 was enacted; that implication of a private right of action for violations of section 34 is consistent with the underlying purpose of section 34 and of the Guardianship and Advocacy Act in general; that termination is an injury which section 34 was designed to prevent; and that implication of a civil private right of action is necessary to provide an adequate remedy for violations of section 34. All of these factors support the existence of a private remedy. See *Sawyer Realty Group, Inc. v. Jarvis Corp.* (1982), 89 Ill. 2d 379, 391, 432 N.E.2d 849; *Sherman v. Field Clinic* (1979), 74 Ill. App. 3d 21, 29-30, 392 N.E.2d 154.

Defendants argue, however, that the trial court's findings that Witt was terminated and that she was penalized, sanctioned or restricted as a consequence of her dealings with the GAC were not sup-

ported by the evidence. The parties agree, with respect to these arguments, that the findings of fact of a trial court, sitting without a jury, will not be disturbed unless manifestly erroneous.

Pat Witt testified at trial that on September 24, 1979, she was hired to work as the head nurse of the Manor House Unit of Forest Hospital, a private psychiatric hospital located in Des Plaines, Illinois. Her duties included administration and the supervision of three patient treatment teams, and one of these teams was the orthomolecular team. During her employment at the hospital, she never received a written "work warning" from any employee superior in rank to her. Such warnings were used by the hospital as disciplinary measures.

According to Witt, on August 20, 1980, she had a telephone conversation with Dr. Melvin Nudelman, the physician in charge of the Manor House Unit, concerning a patient in the orthomolecular program who wanted to terminate his participation in the program. She told Nudelman that a doctor had threatened to have the patient committed, and that she intended to support the patient's position. Subsequently, the patient contacted the GAC, and on August 21, 1980, a staff attorney from the GAC, named Jerry Brost, came to the hospital and had two conversations with Witt. The following day, Witt made a telephone call from her home to the Human Rights Authority (HRA), a division of the GAC. She spoke to Ms. Betty McKee concerning rights violations and patient care issues. During the conversation, McKee told Witt that the GAC had already planned an investigation of Forest Hospital. On August 23, 1980, Witt spoke to Dr. Robert Simon, administrator of the hospital. She told him that the HRA was planning an investigation of the hospital, and that she had spoken to the HRA. She asked for his advice on how to prepare for the investigation, but he did not respond. On August 26, 1980, Witt spoke to Michael Artery, general attorney for the hospital, in his office at the hospital. She also told him that she had spoken to the HRA. On August 27, 1980, Witt had a conversation with Karen Sarasin, director of nursing at the hospital, and Witt told her about the upcoming investigation. Witt's next work day after the day of this last conversation was September 2, 1980. On that day, Witt met with Sarasin and Dr. Simon in Sarasin's office. Dr. Simon told Witt that he was relieving her from her position as head nurse, and he offered her a position as a staff nurse in another unit. That position was three grades below head nurse. Witt refused the offer, and after finishing her shift that day, she took accrued sick days off of work until September 10, 1980. On September 16, 1980, Witt testified at a commitment hearing on behalf of the patient. She had been subpoenaed by the GAC. On Sep-

tember 19, 1980, Witt and coplaintiff Mroczkowski, who also testified that her employment status at Forest Hospital was uncertain after she had had contact with the GAC, went to Sarasin's office at the hospital and requested from Sarasin a written statement of their employment status. Sarasin did not respond, and Witt told her that the Illinois Nursing Association had advised them that in the absence of such a written statement, they should report for duty to their respective positions at the hospital. Subsequently, Dr. Simon came to Sarasin's office. Dr. Simon shouted at them, and Witt asked him about her and Mroczkowski's employment status. Dr. Simon would not answer this inquiry, so Witt told him about the advice they had received from the Illinois Nursing Association. Dr. Simon responded that Witt and Mroczkowski were trespassing on hospital property and that if they reported for duty the next morning and entered any clinical areas, they would be arrested for assault and battery as well as trespassing. After this exchange, no one from the hospital, including Dr. Simon and Sarasin, ever called Witt concerning a position of employment for her at the hospital. Mroczkowski's testimony as to the confrontation with Dr. Simon on September 19, 1980, was substantially similar to that of Witt.

Defendants suggest it was merely coincidental that Forest Hospital's action with respect to Witt occurred at about the same time as her dealings with the GAC. They contend that the action in relieving her of her duties as head nurse was taken because of Witt's lack of support for the orthomolecular treatment program and because of an incident involving the mishandling of a patient by Witt. They rely primarily on certain testimony by Karen Sarasin and Dr. Robert Simon. Sarasin testified that Witt had difficulty administering and supervising the orthomolecular treatment program because of her negative and antagonistic attitude toward that program, and that Witt had made derogatory comments in her presence about Dr. Thomas Stone, the physician in charge of the orthomolecular team, and about the orthomolecular program itself. As director of nursing, it was Sarasin's job to evaluate the head nurses, including Witt. Sarasin made written good evaluations of Witt every two months, and according to Sarasin, Witt received evaluations. In the written evaluation of Witt's performance for February and March of 1980, however, Sarasin had written: "Pat is efficient in planning and organizing work, however, her disagreement with one of the treatment programs in the hospital contributes to an uncomfortable situation on the unit." The program referred to by this remark was the orthomolecular program. Dr. Simon testified that an incident involving Witt's mishandling of a cer-

tain patient on August 27 or 28, 1980, led to the decision to relieve Witt from her position as head nurse.

The trial court, after hearing the evidence, found that on September 2, 1980, Witt was demoted and that she was later terminated. Further, the trial court found that Witt was terminated because of her communication with the GAC, not because of apparent deficiencies in her work. These findings of fact cannot be said to be against the manifest weight of the evidence. Witt's testimony concerning the events of September 19, 1980, was sufficient to support a finding that her employment was terminated. Furthermore, her testimony was sufficient to support a conclusion that she was terminated because she had provided information to the GAC; notwithstanding the testimony of Sarasin and Dr. Simon. The trial judge, as the trier of fact, was in a position superior to this court to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. We will not disturb his finding that Witt was terminated because of her communication with the GAC.

■ Defendants also argue that the relief awarded to Witt was improper. We first address the propriety of the order of the trial court enjoining defendants to restore Witt to her position as head nurse at Forest Hospital. Defendants rely on the well-settled rule that personal service contracts should not be specifically enforced. In *Zannis v. Lake Shore Radiologists, Ltd.* (1979), 73 Ill. App. 3d 901, 904, 392 N.E.2d 126, the court stated: "Plaintiff's contract with defendant *** was a personal service contract. It is well settled that, with reference to such contracts, when specific performance is sought, a court should not compel an employee to work for his employer, nor compel an employer to retain an employee in his service. [Citations.]" (See also *Kurle v. Evangelical Hospital Association* (1980), 89 Ill. App. 3d 45, 53-54, 411 N.E.2d 326.) The *Zannis* court stated the reasons behind this rule. First, it would be impractical, if not impossible, for a court to provide the continuous supervision necessary to enforce an order for specific performance, especially where the contract calls for services which require special skill, knowledge, judgment or discretion. (73 Ill. App. 3d 901, 904.) Secondly, since personal service contracts often require a relationship of cooperation and trust between the parties to the contract, as a matter of public policy courts will avoid the friction that would be caused by compelling an employee to work, or an employer to hire or retain someone against their wishes. 73 Ill. App. 3d 901, 905.

Witt contends that *Zannis* and *Kurle* are distinguishable, because

this case involves the tort of retaliatory discharge, not specific performance of a contract. She further contends that section 34 of the Guardianship and Advocacy Act would not provide effective protection for employees discharged in violation thereof, unless reinstatement was available as a remedy, and that an order of reinstatement may be necessary to make an injured plaintiff whole.

Section 34, however, does not authorize reinstatement as a remedy for its violation. Additionally, Witt does not cite any Illinois case law supporting the availability of reinstatement as a remedy for a retaliatory discharge.

Although we are unwilling to say that reinstatement should never be available as a remedy for violations of section 34 (see *Kurle v. Evangelical Hospital Association* (1980), 89 Ill. App. 3d 45, 56 (Seidenfeld, P.J., specially concurring)), we are of the opinion that reinstatement is not an appropriate remedy under the facts and circumstances of the instant case. In this case, the trial judge made a written finding of fact that Witt was insubordinate, disruptive and openly critical of and insulting to employees superior in rank to her at the hospital. Although the trial judge also found that Witt's communication with the GAC triggered the action taken by the hospital against her, we believe that the former finding makes an award of reinstatement inappropriate. To compel the hospital to reinstate Witt under these circumstances, we would have to ignore the relationship of cooperation and trust required between a nurse and the hospital that employs her.

The trial court's award of compensatory damages to Witt assumed that she would be reinstated to her position as head nurse. In a written opinion, the trial court stated: "[T]he measure of damages [as to Witt] is the difference between the amount she would have earned as head nurse from the date of her last employment in that position until her reinstatement to such position less the amount she would have earned as a staff nurse at Forest." Accordingly, since we reverse the order requiring reinstatement, this action must be remanded to the trial court on the issue of compensatory damages.

Since we are remanding on the issue of compensatory damages, we also authorize the trial court to reconsider its holding that Witt failed to discharge her duty to mitigate her damages because "Witt had an obligation to accept the employment offered by defendants pending the outcome of this litigation or to obtain other employment." The evidence shows that on September 2, 1980, Witt was offered a position as a staff nurse at the hospital. The trial court's statement in its opinion that Witt had an obligation to accept this of-

fer assumes that the offer could have been accepted by her after she was terminated. On remand, the trial court will be able to determine the validity of this assumption. Since we agree with the parties that the trial court's ruling that Witt failed in her duty to mitigate damages may be inconsistent with its finding of fact that Witt's employment had been terminated by the hospital, we believe the trial court should reconsider this issue. We also observe in this regard, that the trial court, in its opinion, stated that "her [Witt's] explanation for failure to obtain other employment [was] inadequate to discharge her legal obligation." Such language appears to be contrary to the general rule that the burden of proof on the issue of a plaintiff's alleged failure to mitigate his damages is on the defendant. (*Ashe v. Sunshine Broadcasting Corp.* (1980), 90 Ill. App. 3d 97, 100-01, 412 N.E.2d 1142.) Under these circumstances, we feel that it is appropriate to remand the question of mitigation of damages to the trial court for reconsideration. See Annot., 44 A.L.R.3d 629 (1972).

Defendants also argue that Witt failed to establish the amount of compensatory damages to which she was entitled. Without specifying their arguments, we observe that the arguments assume that Witt failed to mitigate her damages because she did not accept the staff nurse position at the hospital. Since we have remanded the issue of mitigation of damages to the trial court, we do not consider this issue.

■ Witt was also awarded $5,000 in punitive damages. In *Kelsay*, our supreme court recognized that "there is no persuasive reason to totally rule out an award of punitive damages in an action for retaliatory discharge," and that "when the facts permit, punitive damages may be properly awarded." (74 Ill. 2d 172, 187.) The *Kelsay* court, however, held that punitive damages should not be awarded in that case because the cause of action forming the basis for their award was a novel one. (74 Ill. 2d 172, 187-90.) Since the facts which form the basis for the instant lawsuit occurred after our supreme court filed its opinion in *Kelsay*, an award of punitive damages in this case would not be subject to the infirmity present in *Kelsay*. (See also *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 134-35.) Moreover, the *Kelsay* court, in reaching its conclusion that punitive damages were inappropriate because the cause of action was novel, observed that at the time of the plaintiff's discharge, there was no provision in the Workmen's Compensation Act making it unlawful to discharge an employee for seeking relief under its provisions. (74 Ill. 2d 172, 181.) Contrary to the situation in *Kelsay*, section 34 of the Guardianship and Advocacy Act clearly made it unlawful to discharge an employee for providing information to the GAC.

Defendants argue, nevertheless, that in September 1980, they could not have foreseen that the tort of retaliatory discharge would be expanded beyond its application to discharges of employees who exercise rights under the Workmen's Compensation Act. They rely on *Rozier v. St. Mary's Hospital* (1980), 88 Ill. App. 3d 994, 411 N.E.2d 50, and the appellate court decision in *Palmateer v. International Harvester Co.* (1980), 85 Ill. App. 3d 50, 406 N.E.2d 595, *modified on appeal* (1981), 85 Ill. 2d 124. In *Rozier*, a case which involved an employee who brought an action alleging that she was fired from her job at the defendant hospital in retaliation for reporting incidents which occurred at the hospital to a local newspaper, the court stated: "the cause of action recognized in *Kelsay* is and should be limited to discharge in retaliation for the employee's exercise of his rights under the Workmen's Compensation Act." (88 Ill. App. 3d 994, 998.) In the paragraph immediately preceding this statement, however, the court implicitly recognized that there may be other public policy mandates which support causes of action for retaliatory discharge. The court stated: "Few, if any, considerations of public policy justify a deviation from the employer's general privilege to fire an at-will employee, with or without just cause." (88 Ill. App. 3d 994, 998.) Moreover, the appellate court in *Palmateer*, in declining to expand the tort of retaliatory discharge to cover an employee who alleged that he was fired because he provided information to local law enforcement authorities and agreed to assist in the investigation and trial of a fellow employee, stated: "In Illinois, an employer is liable when he terminates a contract at will if that termination violates a contract provision, a statute, or public policy." (85 Ill. App. 3d 50, 52.) Thus, we do not think that defendants can reasonably argue that it was unforeseeable that the tort of retaliatory discharge would be expanded to situations other than employees who are fired for exercising rights under the Workmen's Compensation Act. Indeed, we do not feel that the opinion in *Kelsay* can be read to restrict the tort of retaliatory discharge to that context. Accordingly, we do not feel that the appellate court opinions in *Rozier* and *Palmateer* preclude an award of punitive damages in the instant case.

■ Defendants also contend that punitive damages are inappropriate in this case because of the trial court's findings that Witt was insubordinate and disruptive. We observe, however, that the trial court specifically held that Witt was not terminated for this reason. Rather, the trial court held that Witt was terminated because of her communication with the GAC. In *Kelsay*, our supreme court stated: "Where punitive damages may be assessed, they are allowed in the

nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future." (74 Ill. 2d 172, 186.) Given the trial court's finding that Witt was terminated in violation of section 34 of the Guardianship and Advocacy Act and the deterrent purpose of punitive damages, we conclude that an award of punitive damages in the instant case would not be improper.

However, since we have held that Witt should not have been reinstated to her position as head nurse at the hospital, and that the trial court must on remand reconsider the issue of compensatory damages, we feel that the award of punitive damages in the amount of $5,000 should be vacated. In that way, the trial court will have the opportunity to fashion a complete remedy, without an award of reinstatement.

For the aforementioned reasons, the judgment of the circuit court of Cook County finding that Witt was wrongfully terminated from her position as head nurse at Forest Hospital is affirmed, the order requiring that she be reinstated to that position is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

McNAMARA, P.J., and McGILLICUDDY, J., concur.